## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **CRIMINAL NO. H-17-488-S** |
| | § | |
| **DAVID GRUDZINSKI** | § | |

## PLEA AGREEMENT

The United States of America, by and through Ryan K. Patrick, United States Attorney for the Southern District of Texas, and Melissa Annis, Assistant United States Attorney, and the defendant, David Grudzinski ("Defendant"), and Defendant's counsel, pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreement

1. Defendant agrees to plead guilty to Counts One, Seventeen, and Eighteen of the Superseding Indictment. Counts One charges Defendant with wire fraud, in violation of Title 18, United States Code, Section 1343. Count Seventeen charges Defendant with mail fraud, in violation of Title 18, United States Code, Section 1341. Count Eighteen charges Defendant with engaging in a monetary transaction in criminally derived funds, in violation of Title 18, United States Code, Section

1

1957. Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

## Punishment Range

2. The **statutory** maximum penalty for each violation of Title 18, United States Code, Sections 1341 and 1343 is imprisonment of not more than 20 years and a fine of not more than $250,000.00. The **statutory** maximum penalty for each violation of Title 18, United States Code, Section 1957, is imprisonment of not more than 10 years and a fine of not more than $250,000.00. Additionally, Defendant may receive a term of supervised release after imprisonment of up to 3 years after a conviction under Title 18, United States Code, Sections 1341, 1343 or 1957. *See* Title 18, United States Code, sections 3559(a)(3) and 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for the entire term of supervised release, without credit for time already served on the term of supervised release prior to such violation. *See* Title 18, United Stated Code, sections 3559(a)(3) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

3.     Pursuant to Title 18, United States Code, section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction for a total payment of $300.00.   The payment will be by cashier's check or money order, payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

## Immigration Consequences

4.   Defendant recognizes that pleading guilty may have consequences with respect to his immigration status.   Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant understands that if he is a naturalized United States citizen, pleading guilty ay result in immigration consequences, such as denaturalization and potential deportation or removal from the United States.   Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty and Defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction.

## Sentencing Guidelines

5.    Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction and not a promise, did not induce his guilty plea, and is not binding on the United States, the Probation Office or the Court.    The United States does not make any promise or representation concerning what sentence the defendant will receive.    Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court.    *See United States v. Booker*, 543 U.S. 220 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

6.    Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

7.    The United States agrees to each of the following:

(a)    If Defendant pleads guilty to Counts One, Seventeen, and Eighteen of the Superseding Indictment, and persists in that plea

4

through sentencing and commits no further criminal offenses, and if the Court accepts this plea agreement, the United States agrees not to oppose Defendant's anticipated request to the Court and the United States Probation Office that he receive a two (2) level downward adjustment pursuant to section 3E1.1(a) of the United States Sentencing Guidelines, should Defendant accept responsibility as contemplated by the Sentencing Guidelines;

(b)     If Defendant qualifies for an adjustment under section 3E1.1(a) of the United States Sentencing Guidelines and the Defendant's offense level is 16 or greater, the United States agrees not to oppose Defendant's request for an additional one-level departure based on the timeliness of the plea if the defendant does not require the Court conduct evidentiary hearings on substantive issues related to his guilt or sentence.

(c)     The United States agrees that the following are not appropriate Sentencing Guideline adjustments under the facts of this case:

1.   §2B1.1(b)(10) for sophisticated means; and
2.   §3B1.3 for use of a special skill

**Agreement Binding - Southern District of Texas Only**

8.   The United States agrees that it will not further criminally prosecute Defendant in the Southern District of Texas for offenses arising from conduct charged in the Superseding Indictment which are known to the United States at the time of the execution of this plea agreement.   This plea agreement binds only the United States Attorney's Office for the Southern District of Texas and Defendant. It does not bind any other United States Attorney.

5

## United States' Non-Waiver of Appeal

9.   The United States reserves the right to carry out its responsibilities under guidelines sentencing.   Specifically, the United States reserves the right:

>   (a)     to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

>   (b)     to set forth or dispute sentencing factors or facts material to sentencing;

>   (c)     to seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

>   (d)     to file a pleading relating to these issues, in accordance with section 6A1.2 of the United States Sentencing Guidelines and Title 18, United States Code, section 3553(a); and

>   (e)     to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

10.   Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the

6

applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

### Rights at Trial

11. Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a) If Defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if, Defendant, the United States, and the court all agree.

(b) At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court; and

(c) At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be

drawn from such refusal to testify. However, if Defendant desired to do so, he could testify on his own behalf.

## Factual Basis for Guilty Plea

12. Defendant is pleading guilty because he is in fact guilty of the charges contained in Counts One, Seventeen, and Eighteen of the Superseding Indictment. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others would be offered to establish Defendant's guilt:

Defendant David GRUDZINSKI ran Coin Telecom Systems, a coin operated telephone business, from his home in Friendswood, Texas. Coin Telecom Systems (CTS) was a Payphone Service Provider (PSP). As a PSP owner, Defendant owned and controlled approximately 450 payphones located at various locations in Texas including Houston, Friendswood, League City, Tomball, Dayton, Lake Jackson and Freeport.

PSPs receive compensation, known in the industry as dial around compensation, for toll-free telephone calls completed from their payphones. Defendant was paid $.494 per completed toll-free call. Defendant utilized an Aggregator to collect dial around compensation on his behalf. Defendant provided Automated Number Identifiers (ANI) for his payphones to the Aggregator through the Aggregator's website. The Aggregator forwarded Defendant's ANI list to the

national clearinghouses and other service providers for payment.

Once the clearinghouses and service providers determined the number of calls originating from payphones identified on Defendant's ANI list, the service providers were invoiced for payment. The toll-free service providers collected the dial around compensation from each toll-free number subscriber for each completed call and the funds were submitted to the Aggregator through the clearinghouses. The Aggregator submitted these payments to Defendant quarterly through an interstate wire communication, that is, an electronic payment via Automated Clearing House (ACH) transfers from the Aggregator in Alexandria, Virginia to Defendant in Friendswood, Texas.

Defendant programmed his payphones to call toll-free telephone numbers in a repeating pattern. Those payphones robotically dialed toll-free telephone numbers assigned to various federal and state government agencies, as well as numerous other private entities. Defendant was able to utilize the smart boards in the payphones to communicate via telephone lines with two "Polling Computers" located at his residence in Friendswood, Texas. In addition to using the Polling Computers to communicate with the payphones to remotely troubleshoot issues with the payphone and obtain equipment status, Defendant remotely programmed the payphones to place telephone calls to specific toll-free numbers when the payphones were not

otherwise in use. This caused the fraudulent billing and payment of dial around compensation by and to Defendant.

Upon receipt of the fraudulently obtained proceeds from the Aggregator via ACH transfer, Defendant caused the further transfer of those funds into other bank accounts over which he had control, frequently in amounts in excess of $10,000. Evidence collected and analyzed by the United States reflects that between 2005 and July 10, 2015, Defendant received approximately $2,400,000.00 in fraudulent dial around compensation.

Defendant sought dial around compensation payment on approximately 450 payphones during each quarter in 2014. Those specific payphone telephone numbers have been identified through the records of the Aggregator utilized by Defendant to obtain dial-around compensation. A court authorized pen register and trap and trace were obtained for two of Defendant's payphones, both of which appeared on the list of ANIs for which he sought payment through the Aggregator. In addition, subscriber records obtained from the telephone providers confirm that both of these telephone numbers were subscribed to by CTS.

Pole cameras were pointed at each of the two monitored payphones during the period the court authorized pen registers and trap and trace devices were installed. These cameras recorded the activity at those payphones twenty-four hours a day,

seven days a week for close to the duration the pen register/trap and trace devices were installed on the two payphones.

Telephone number 281-996-6754 was a CTS payphone (hereinafter payphone 1) located at 4001 FM 2351, Friendswood, Texas. Payphone 1 was located at a gas station and convenience store with two CTS payphones in the parking lot.

The pen register/trap and trace device on payphone 1 initially ran from approximately April 25, 2014 through June 23, 2014. During that time period, the payphone primarily dialed two "800" numbers multiple times every day: 800-448-3927, which was a toll-free number to reach the Texas Health and Human Services Commission and 800-829-1954 which was a toll-free number for the IRS Refund Hotline. The duration of almost every call to these 1-800 numbers was under one minute.

The below table reflects a selection of calls captured by the pen register/trap and trace device on payphone 1 during a time period for which a federal agent has reviewed the camera footage for these dates and time-frames:

| Date | Time | Number Called |
|------|------|---------------|
| 04/30/2014 | 20:02:21 | 800-448-3927 |
| 05/05/2014 | 08:03:19 | 800-448-3927 |
| 05/06/2014 | 04:03:19 | 800-448-3927 |
| 05/08/2014 | 07:59:18 | 800-448-3927 |
| 05/11/2014 | 02:27:21 | 281-546-6732** |
| 05/12/2014 | 03:59:16 | 800-448-3927 |
| 05/23/2014 | 11:05:10 | 800-829-1954 |
| 05/25/2014 | 21:00:09 | 800-829-1954 |

| 06/06/2014 | 06:59:05 | 800-448-3927 |
| 06/16/2014 | 09:08:02 | 800-829-1954 |

Of the above ten calls, the only call that the camera showed an actual person dialing the payphone, was the fifth call with the asterisks next to the number. Agents did not observe anyone at the payphone on the date and in the time-frame when the 1-800 numbers were dialed on the other nine calls reflected in the above chart. Since the pole camera and pen register/trap and trace device were not synchronized to the second, Agents reviewed the video footage for approximately 10 minutes before and 10 minutes after each call to verify there was no individual dialing the payphones during the time the 800 numbers were being dialed.

**Count 1:** The second court authorized pen register/trap and trace device was on the CTS payphone assigned telephone number 713-777-8039 (hereinafter payphone 2). Payphone 2 was located at 7802 Hillcroft Avenue, Houston, Texas, which was a gas station and convenience store where three CTS payphones were located in the parking lot. The pen register/trap and trace device on payphone 2 ran from approximately April 29, 2014 through June 14, 2014. During the period of the pen register/trap and trace device, primarily two "800" numbers were called multiple times each day from the payphone. Those two numbers were 800-373-3343, a toll-free number to reach Federal Home Loan Mortgage Corporation, aka

Freddie Mac and 800-321-1080 a toll-free number to contact the Defense Finance and Accounting Service. Again, the duration of almost every call to these 1-800 numbers was under one minute.

The below table reflects ten selected telephone calls captured on pen register/trap and trace devices on payphone 2 and for which the camera footage has been reviewed by federal agents for the time period before, during and after the calls captured on the pen register/trap and trace device:

| Date | Time | Number Called |
|------|------|---------------|
| **04/30/2014 (count 1)** | **05:01:57** | **800-373-3343** |
| 04/30/2014 | 09:58:39 | 713-401-7877** |
| 05/07/2014 | 05:03:06 | 800-321-1080 |
| 05/11/2014 | 13:13:12 | 800-373-3343 |
| 05/15/2014 | 12:05:16 | 800-321-1080 |
| 05/21/2014 | 09:02:23 | 800-373-3343 |
| 06/01/2014 | 12:05:38 | 800-321-1080 |
| 06/04/2014 | 17:05:43 | 800-321-1080 |
| 06/10/2014 | 08:58:50 | 800-373-3343 |
| 06/12/2014 | 13:01:53 | 800-321-1080 |

Of the above ten calls, the only call that the camera showed there was a person dialing the number at the payphone, was the second call with the asterisks next to the number. For the other nine 800 numbers listed in the above chart, no one was present at the payphone to press the numbers on the physical dial pad on the face of the payphone at or near the time of the calls captured on the pen register/trap and trace device.

On April 30, 2014, the pen register/trap and trace device reflected a call from payphone 2, located at 7802 Hillcroft Avenue, Houston, Texas to toll-free number 1-800-373-3343 assigned to the Federal Home Loan Mortgage Corporation in Virginia. This call occurred at approximately 5:01 am. and was routed through telephone lines from Houston, Texas to a call center in Virginia. According to the records maintained by the national clearinghouse, this call from payphone 2 was a completed and compensable call, and Defendant received payment for this call.

In January 2015, agents again received court authorization to place a pen register and trap and trace devices on payphones 1 and 2. Pole cameras were utilized to determine whether someone was physically present using the dial pad to place the calls at or near the time the pen register indicated a toll-free number was called from the payphone. Agents again compared randomly selected calls captured on the pen registers installed on payphones 1 and 2, to the camera footage of payphones 1 and 2. The camera footage reviewed covered the 30 minutes prior to and after the time reflected on the pen register for each selected call. These reviews again identified numerous instances in which each payphone robotically dialed the same two toll-free numbers.

On April 10, 2015, federal agents executed a search warrant at Defendant's residence in Friendswood, Texas. Evidence was recovered during the search,

related to this fraudulent scheme. Several handwritten lists of toll-free numbers were located as well as numerous internet printouts of toll-free numbers. One handwritten list, titled "Useful Toll Free Numbers", contained 16 different 1-800 numbers listed with the contact identity for the 1-800 number listed beside the number. These included 1-800 numbers for the following:

Securities and Exchange Commission
Office of Motor Carriers
Justice Statistics Clearinghouse
Occupational Safety and Health
Retired Military Pay Center
Federal Home Loan Info
Auto and Motorcycle Safety Hotline

A 17-page computer printout of 519 ANI's (payphone telephone numbers) was discovered during the search. This computer printout reflected a date of 6/13/2012 at 10:25 am. The ANI's listed on these 17 pages were broken down into 12 "locations." The first location was described as "chey" (believed to be the Cheyenne Center) and "star" (believed to be the Star of Hope). Handwritten notes on the printout reflect there were 11 payphones at the Cheyenne Center and 19 at the Star of Hope. The list identified 45 separate telephone numbers for payphones in each of Locations 2 through 11. Location 12 identified 39 payphone numbers. Both payphone 1 and payphone 2, as described above, were listed as ANI's on this list. Payphone 1 was identified as one of the 45 payphones in Location 6 and payphone

2 was one of the 45 payphones in Location 10. Other handwritten notes located during the search further identify Locations 2 through 12 as "LOC-NOIN-1 489 phones."

Numerous handwritten pages referencing the above described locations were found during the search. Two 1-800 numbers were listed next to each identified location which were bracketed together. To the left of the first 1-800 in the bracket was the phrase "Reg. 333" and beside the second 1-800 number in the bracket were the numbers "334."

Defendant changed the toll-free numbers programmed into each payphone at each location from time to time. Handwritten lists breaking down the 12 locations were recovered. The toll-free numbers identified as being programmed into registries 333 and 334, for each of the 45 or so payphones in each location, changed on the various lists.

Additionally, handwritten lists of toll-free numbers were located which were identified as numbers to "test." Next to certain toll-free numbers were various notations such as "good," "no ans.," "IRS," "SS X," and "medicare ? X." Other toll-free numbers listed were often followed by a check mark or an X. From time to time, certain numbers on the telephone number lists also carried a handwritten notation of "blocked" or otherwise indicated the toll-free number would not accept

calls from payphones.

Numerous internet printouts of toll-free numbers were also located. Many of the highlighted and check-marked telephone numbers on these printouts were the same telephone numbers identified on the pen-registers and in the analysis of the Call Detail Spreadsheets obtained from a national clearinghouse related to dial-around compensation sought for Defendant's payphones.

Found among Defendant's documents were printed instructions which detailed the computer programming and dialing instructions for approximately 489 of Defendant's payphones. The instructions identified payphone programming and registry options for these payphones. A review of the registry and options information included in the printed instructions for his payphones designated "LOC-NOIN," identified four toll-free numbers that were programmed in registry option table rows 333, 334, 335, and 336:

   (a)   The number 888-382-1222 (National Do Not Call Registry) was programmed in registry option table row 333.

   (b)   The number 800-558-8321 (Texas Workforce Commission Teleserve line) was programmed in registry option table row 334.

   (c)   The number 800-772-1213 (Social Security Administration) was programmed in registry option table row 335.

   (d)   The number 800-777-7328 (Lone Star Help Desk) was programmed in registry option table row 336.

Dial-Around Submission Reports were also found in the search. These reports had been downloaded from the Aggregator's website. These Reports provided Defendant with a historical payment history by year and quarter for the toll-free number queried by Defendant, and detailed the total number of paid calls per quarter to the queried toll-free number. Each of the reports included handwritten notes, which appeared to be calculations that identified the number of calls per day to a particular toll-free number for the quarter queried.

Simultaneous with the search of Defendant's Friendswood home was the search and seizure of the smartboard for payphone 1. The smartboard was examined by an individual with expertise in dial-around compensation as well as the hardware and software utilized in the payphone business. The examination confirmed two toll-free telephone numbers had been programmed into the registry options of payphone 1, at registry rows 333 and 334. The expert explained the toll-free telephone numbers would automatically be dialed when the programmed alarms were activated. Upon examination of the smartboard, the alarm programmed to activate the calling of the toll-free numbers was the inactivity alarm. During an inactivity period, the alarm would activate and cause the payphone to dial the programmed toll-free numbers causing fraudulent charges.

Computers utilized by Defendant in his payphone business were imaged and

searched. Located on these computers were reports identified as SMDR Reports. These reports were generated from the software and hardware utilized by Defendant in his payphone business. These particular reports reflect the telephone numbers actually dialed from the keypad found on the face of each payphone. The SMDR reports were utilized in the calculation, in part, of the losses sustained by the victims. For the time periods where these reports exist, agents have compared the calls identified in the SMDR report as actual dialed numbers to the Call Detail Spreadsheet from the national clearinghouse of the toll-free calls for which Defendant received compensation. The legitimate calls captured in the SMDR reports were deducted from the total amount paid through the Aggregator to reveal the fraudulently dialed calls.

As described above and in Count 1 of the Superseding Indictment, the April 30, 2014 fraudulent call to the Federal Home Loan Mortgage Corporation in Virginia was captured on the pen register installed on payphone 2. Defendant obtained dial-around compensation for this completed telephone call from Houston to Virginia. An SMDR report confirmed that this 5:01 a.m. call was not dialed from the dial pad on the payphone located at 7802 Hillcroft Avenue, Houston, Texas.

**Count 17:** Defendant leased the physical location where his payphones were installed. He made quarterly payments by check to the businesses from whom

he leased the space. Defendant referred to these payments as "Quarterly Payphone Commissions." The quarterly payments were mailed by depositing into an authorized depository for mail matter, the checks to be sent and delivered by the United States Postal Service.

On February 6, 2015, Defendant caused to be placed in the United States mail, an envelope from Coin Telecom Systems in Friendswood, Texas to a business located in Crosby, Texas. The envelope contained a check written on Wells Fargo Bank account xxx5546, check 7705 which was payable as a "Quarterly Payphone Commission." The original check and envelope were located during the search of Defendant's home in Friendswood, Texas. The front of the envelope bears the inked United States Postage, stamped on the face of the envelope. The United States Postal Service was unable to deliver the mailed envelope as evidenced by the affixed yellow sticker to the envelope, which indicated the first class letter was being returned to the sender as undeliverable.

**Count 18:** On July 10, 2014, Defendant received an ACH deposit of $91,205.02 in dial-around compensation from the Aggregator for toll-free calls from his payphones during the first quarter of 2014. This ACH deposit was made into Defendant's business account xxx5219 held in the name of D&L Grudzinski Enterprises, Inc. at Wells Fargo Bank. The deposit included payments from the

subscribers of toll-free number for calls which were fraudulently placed by programming the payphones to make the calls during inactive periods.

SMDR reports exist for the entire 1st quarter of 2014 with the exception of January 1, 2014. A comparison of the relevant SMDR report with the list of paid calls for the same period revealed that at least $82,211.00 of the $91,205.02 deposited was generated by fraud.

Prior to the ACH deposit of $91,205.02 into Defendant's Wells Fargo Bank account xxx5219 on July 11, 2014, the balance in the D&L Grudzinski Enterprises, Inc. account was $418.72.

On July 14, 2014, Defendant transferred $52,000 from the D&L Grudzinski Enterprises, Inc. account xxx5219 to his D&L Grudzinski Enterprises, Inc./Coin Telecom Systems checking account xxx5546 at Wells Fargo Bank. The funds which made up the $52,000 transfer included over $10,000 in criminally derived proceeds from the Defendant's wire and mail fraud scheme.

### Breach of Plea Agreement

13. If Defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and Defendant's plea and sentence will stand. If at any time Defendant retains, conceals, or disposes of assets in violation of this

plea agreement, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

### Restitution, Forfeiture, and Fines – Generally

14. This Plea Agreement is being entered into by the United States on the basis of Defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which he has any financial interest. Defendant agrees not to dispose of any assets or take any action that would effect a transfer of property in which he has an interest, unless Defendant obtains the prior written permission of the United States.

15. Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500 or similar form) within 7 days of signing this plea agreement. Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms permitting the United States to obtain tax information, bank account records, credit histories, and social security information.

Defendant agrees to discuss and answer any questions by the United States relating to Defendant's complete financial disclosure.

16. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines, including, but not limited to, surrendering title, executing a warranty deed, signing a consent decree, stipulating to facts regarding the transfer of title and the basis for the forfeiture, and signing any other documents necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of his assets to deliver all funds and records of such assets to the United States.

17. Defendant understands that forfeiture, restitution, and fines are separate components of sentencing and are separate obligations.

**Restitution**

18. Defendant agrees to pay full restitution to the victim(s) regardless of the count(s) of conviction. Defendant stipulates and agrees that as a result of his criminal conduct, the victims incurred a monetary loss. Defendant understands and agrees that the Court will determine the amount of restitution to fully compensate the victims. Defendant agrees that restitution imposed by the Court will be due and payable immediately and that Defendant will not attempt to avoid or delay payment. Subject to the provisions of paragraph 5 above,

**Forfeiture**

19.    Defendant stipulates and agrees that the property listed in the Indictment's Notice of Forfeiture (and in any supplemental Notices) is subject to forfeiture, and Defendant agrees to the forfeiture of that property.

20.    Defendant stipulates and agrees that the factual basis for his guilty plea supports the forfeiture against him and in favor of the United States, and Defendant agrees to the imposition of a personal money judgment for an amount to be determined at sentencing against him and in favor of the United States of America. Defendant stipulates and admits that one or more of the conditions set forth in Title 21, United States Code, section 853(p), exists.   Defendant stipulates and admits that one or more of the conditions set forth in Title 21, United States Code, § 853(p) exists. Defendant agrees to forfeit any of his property, or his interest in property, up to the value of any unpaid portion of the money judgment, until the money judgment is fully satisfied.

21.    Defendant agrees to waive any and all interest in any asset which is the subject of a related administrative or judicial forfeiture proceeding, whether criminal or civil, federal or state.

22.    Defendant consents to the order of forfeiture becoming final as to Defendant immediately following this guilty plea, pursuant to Federal Rule of Criminal Procedure 32.2(b)(4)(A).

## Fines

23.    Defendant understands that under the Sentencing Guidelines the Court is permitted to order Defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any. Defendant agrees that any fine imposed by the Court will be due and payable immediately, and Defendant will not attempt to avoid or delay payment.

## Complete Agreement

24.    This written plea agreement, consisting of 28 pages, including the attached addendum of Defendant and his attorney, constitutes the complete plea agreement between the United States, Defendant, and Defendant's counsel.    No promises or representations have been made by the United States except as set forth in writing in this plea agreement.    Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

25.    Any modification of this plea agreement must be in writing and signed by all parties.

Filed at _Houston_, Texas, on _April 13_, 2018.

_____
David Grudzinski, Defendant

Subscribed and sworn to before me on _April 13_, 2018.

DAVID J. BRADLEY, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

Ryan K. Patrick
United States Attorney

By: _____          _____
Melissa J. Annis                                George McCall Secrest, Jr.
Assistant United States Attorney                Attorney for Defendant
Southern District of Texas

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-17-488-S |
| | § | |
| DAVID GRUDZINSKI | § | |

## PLEA AGREEMENT -- ADDENDUM

I have fully explained to Defendant his rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements and I have fully and carefully explained to Defendant the provisions of those Guidelines which may apply in this case. I have also explained to Defendant that the Sentencing Guidelines are only advisory and the court may sentence Defendant up to the maximum allowed by statute per count of conviction. Further, I have carefully reviewed every part of this plea agreement with Defendant. To my knowledge, Defendant's decision to enter into this agreement is an informed and voluntary one.

_____
George McCall Secrest, Jr.
Attorney for Defendant

_____
April 13, 2018
Date

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained, and I understand, all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

_____
David Grudzinski
Defendant

_____
4-13-18
Date